## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| ANURAG KACHRODIA, Derivatively on Behalf of ACADIA HEALTHCARE COMPANY, INC., | Case No.: |
| Plaintiff, | |
| DEBRA K. OSTEEN, CHRISTOPHER H. HUNTER, DAVID M. DUCKWORTH, HEATHER DIXON, REEVE B. WAUD, JASON R. BERNHARD, E. PEROT BISSELL, MICHAEL J. FUCCI, VICKY B. GREGG, WILLIAM F. GRIECO, PATRICE A. HARRIS, R. DAVID KELLY, and WADE D. MIQUELON, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| ACADIA HEALTHCARE COMPANY, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Anurag Kachrodia ("Plaintiff"), by and through Plaintiff's undersigned counsel, derivatively on behalf of Nominal Defendant Acadia Healthcare Company, Inc. ("Acadia" or the "Company"), brings this Verified Shareholder Derivative Complaint against Debra K. Osteen ("Osteen"), Christopher H. Hunter ("Hunter"), David M. Duckworth ("Duckworth"), Heather Dixon ("Dixon"), Reeve B. Waud ("Waud"), Jason R. Bernhard ("Bernhard"), E. Perot Bissell ("Bissell"), Michael J. Fucci ("Fucci"), Vicky B. Gregg ("Gregg"), William F. Grieco ("Grieco"), Patrice A. Harris ("Harris"), R. David Kelly ("Kelly"), and Wade D. Miquelon ("Miquelon")

1

(collectively, the "Individual Defendants" and, together with Acadia, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by Acadia with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought against certain current and former Acadia officers and members of the Company's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants between February 28, 2020 and October 31, 2024, inclusive (the "Relevant Period").

2. Acadia Healthcare is a behavioral healthcare services provider. Acadia operates behavioral healthcare facilities across the country. Acadia's facilities include acute inpatient psychiatric facilities, specialty treatment facilities, comprehensive treatment centers, and residential treatment centers.

3. Most of Acadia's revenue comes from acute inpatient psychiatric facilities. Acadia claims its acute inpatient psychiatric facilities provide a "high level of care" to stabilize patients that are a threat to themselves or others, and that typical lengths of stay for "crisis stabilization" and "acute care" range from three to five days and from five to twelve days, respectively.

4. Acadia receives payments from various payors, including state governments under their Medicaid and other programs, commercial insurers, the federal government under the

2

Medicaid program administered by the Centers for Medicare and Medicaid Services, and individual patients and clients. As of 2023, Acadia received most of its payments from Medicaid.

5.    Throughout the Class Period, Defendants touted, *inter alia*, the quality and safety of Acadia's inpatient services and the Company's strong financial performance driven by solid volumes and growth in patient days and same facility revenue. Defendants further touted strong revenue trends driven by rate increases across all payors and positive coverage and reimbursement trends for Medicaid.

6.    Unbeknownst to investors, however, Acadia admitted and held patients against their will in its facilities, and kept patients beyond the length of time that was medically necessary to deceive payors into continuing to pay for such patients' care. For example, the Company deployed "assessors" to pressure emergency rooms to send patients to Acadia facilities, and Acadia would not release patients until their insurance ran out. Acadia also filed frivolous petitions with courts to delay patients' release and told employees to use "buzzwords" and omit other words in patients' charts to create a false impression of their mental state.

7.    On September 1, 2024, the truth began to emerge when *The New York Times* published an article entitled "How a Leading Chain of Psychiatric Hospitals Traps Patients" (the "September 2024 Article"). According to the September 2024 Article, a *New York Times* investigation found that some of Acadia's success "was built on a disturbing practice: Acadia has lured patients into its facilities and held them against their will, even when detaining them was not medically necessary."

8.    On this news, the price of Acadia common stock fell more than 4.5%, from a closing price of $81.93 per share on August 30, 2024 to a closing price of $78.21 per share on September 3, 2024.

9.	On September 27, 2024, Acadia disclosed that on September 24, 2024 it had received a request for information from the U.S. Attorney's Office for the Southern District of New York and a grand jury subpoena from the U.S. District Court for the Western District of Missouri "related to its admissions, length of stay and billing practices."

10.	On this news, the price of Acadia common stock fell more than 16%, from a closing price of $75.66 per share on September 26, 2024, to a closing price of $63.28 per share on September 27, 2024.

11.	On October 3, 2024, Acadia received a letter from Adam B. Schiff, Judy Chu, and Julia Brownley, members of the U.S. House of Representatives from California. Their letter sought answers to questions raised by the September 2024 Article, including reports "that inpatient psychiatric facilities owned by Acadia have wrongfully detained patients under medically unnecessary circumstances."

12.	On this news, the price of Acadia common stock fell more than 3.5%, from a closing price of $58.80 per share on October 2, 2024, to a closing price of $56.71 per share on October 3, 2024.

13.	On October 18, 2024, the *New York Times* published another article entitled "Veterans Dept. Investigating Acadia Healthcare for Insurance Fraud" reporting that the Veterans Affairs Department was investigating whether Acadia "is defrauding government health insurance programs by holding patients longer than is medically necessary" and "whether Acadia billed insurance programs for patients who were stable enough to be released and did not need intensive inpatient care, according to three people with knowledge of the inquiry."

14.	On this news, the price of Acadia common stock fell more than 12%, from a closing price of $59.32 per share on October 17, 2024, to a closing price of $52.03 per share on

October 18, 2024.

15.     The truth was fully revealed to investors on October 30, 2024, when Acadia disclosed that it had lowered its full-year 2024 revenue outlook to a range of $3.15 to $3.165 billion. Acadia also lowered its full-year 2024 adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") to a range of $725 to $735 million.

16.     During a related earnings call held on October 31, 2024, Chief Financial Officer ("CFO") Defendant Dixon disclosed that the lowered full-year 2024 guidance was in part due to slower same-store patient day growth of only 3% in the month of October, "which we believe is a result of the recent headlines and reporting in the media."

17.     On this news, the price of Acadia common stock fell more than 18%, from a closing price of $52.08 per share on October 30, 2024, to a closing price of $42.69 per share on October 31, 2024.

18.     In light of the Individual Defendants' misconduct, the Company, as well as Defendants Osteen, Hunter, Duckworth, and Dixon, were named as defendants in three federal securities fraud class action lawsuits pending in the United States District Court for the Middle District of Tennessee, captioned *Kachrodia v. Acadia Healthcare Company, Inc., et al.,* Case No. 3:24-cv-01238 (M.D. Tenn.), *Dyar v. Acadia Healthcare Company, Inc., et al.,* Case No. 3:24-cv-01300 (M.D. Tenn.), and *City of Fort Lauderdale Police and Firefighters' Retirement System v. Acadia Healthcare Company, Inc., et al.,* Case No. 3:24-cv-01447 (M.D. Tenn.) (the "Securities Class Actions"). The Securities Class Actions have further subjected Acadia to the need to undertake internal investigations and the need to implement adequate internal controls, as well as exposed the Company to massive class-wide liability.

5

## JURISDICTION AND VENUE

19.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims asserted herein raise a federal question under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78u-4(f)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

20.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Acadia's principal executive offices are located in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

24.     Plaintiff is a current shareholder of Acadia and has continuously held Acadia common stock at all relevant times.

25.     Nominal Defendant Acadia is incorporated under the laws of Delaware, and its principal executive offices are located at 6100 Tower Circle, Suite 1000, Franklin, Tennessee. The Company's common stock trades on the Nasdaq under the symbol "ACHC."

26.     Defendant Osteen served as a Company director from 2018 until 2024 and previously served as the Company's Chief Executive Officer ("CEO") from December 2018 until March 2022. According to the 2024 Proxy Statement, in 2023, Defendant Osteen received $259,498 in total compensation from the Company. As of March 26, 2024, Defendant Osteen beneficially owned 675,833 shares of Acadia common stock.

27.     Defendant Hunter has served as a Company director and as the Company's CEO since April 2022. According to the 2024 Proxy Statement, in 2023, Defendant Hunter received $7,404,606 in total compensation from the Company. As of March 26, 2024, Defendant Hunter beneficially owned 95,828 shares of Acadia common stock.

28.     Defendant Duckworth served as the Company's Chief Financial Officer ("CFO") from April 2014 until his resignation in July 2023. According to the 2024 Proxy Statement, in 2023, Defendant Duckworth received $2,113,205 in total compensation from the Company. According to the 2024 Proxy Statement, as of March 26, 2024, Defendant Duckworth beneficially owned 238,531 shares of Acadia common stock.

29.     Defendant Dixon has served as the Company's CFO since July 2023. According to the 2024 Proxy Statement, in 2023, Defendant Dixon received $6,677,203 in total compensation from the Company. According to the 2024 Proxy Statement, as of March 26, 2024, Defendant Dixon beneficially owned 54,572 shares of Acadia common stock.

30.     Defendant Waud has served as a Company director since December 2005. Defendant Waud serves as Chairman of the Board. According to the 2024 Proxy Statement, in 2023, Defendant Waud received $401,968 in total compensation from the Company. As of March 26, 2024, Defendant Waud beneficially owned 689,233 shares of Acadia common stock.

7

31.     Defendant Bernhard has served as a Company director since December 2019. According to the 2024 Proxy Statement, in 2023, Defendant Bernhard received $261,998 in total compensation from the Company. As of March 26, 2024, Defendant Bernhard beneficially owned 18,436 shares of Acadia common stock.

32.     Defendant Bissell has served as a Company director since April 2013. According to the 2024 Proxy Statement, in 2023, Defendant Bissell received $298,998 in total compensation from the Company. As of March 26, 2024, Defendant Bissell beneficially owned 36,209 shares of Acadia common stock.

33.     Defendant Fucci has served as a Company director since October 2020. According to the 2024 Proxy Statement, in 2023, Defendant Fucci received $289,498 in total compensation from the Company. As of March 26, 2024, Defendant Fucci beneficially owned 12,375 shares of Acadia common stock.

34.     Defendant Gregg has served as a Company director since May 2016. According to the 2024 Proxy Statement, in 2023, Defendant Gregg received $296,998 in total compensation from the Company. As of March 26, 2024, Defendant Gregg beneficially owned 26,851 shares of Acadia common stock.

35.     Defendant Grieco has served as a Company director since November 2011. According to the 2024 Proxy Statement, in 2023, Defendant Grieco received $299,498 in total compensation from the Company. As of March 26, 2024, Defendant Grieco beneficially owned 76,040 shares of Acadia common stock.

36.     Defendant Harris has served as a Company director since 2023. According to the 2024 Proxy Statement, in 2023, Defendant Harris received $259,519 in total compensation from

8

the Company. As of March 26, 2024, Defendant Harris beneficially owned 95,828 shares of Acadia common stock.

37.     Defendant Kelly has served as a Company director since June 2022. According to the 2024 Proxy Statement, in 2023, Defendant Kelly received $256,973 in total compensation from the Company. As of March 26, 2024, Defendant Kelly beneficially owned 5,658 shares of Acadia common stock.

38.     Defendant Miquelon has served as a Company director since January 2012. According to the 2024 Proxy Statement, in 2023, Defendant Miquelon received $289,498 in total compensation from the Company. As of March 26, 2024, Defendant Miquelon beneficially owned 46,074 shares of Acadia common stock.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

39.     By reason of their positions as officers, directors, and/or fiduciaries of Acadia and because of their ability to control the business and corporate affairs of Acadia, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

40.     Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business

9

prospects so that the market price of the Company's stock would be based on truthful and accurate information.

41.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

42.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all

10

times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

43.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

## THE CODE OF CONDUCT

44.     Acadia maintains a Code of Conduct, which states that its purpose is to "provide[] guidance about key principles to guide our actions while at work and beyond." The Code of Conduct states that it applies to all employees and the Board of Directors: "Support for Acadia's Compliance Program and Code of Conduct starts from the top, our Board of Directors and

Executive Leadership Team. With this support, it is up to all of us to abide by the guidelines set forth in our Code of Conduct and do the right thing in all circumstances."

45.    In a section titled "Our Culture of Integrity," the Code of Conduct explains that the Company promotes a "just culture," which it describes as "one that supports a commitment to shared accountability between employees and the organization. It is a culture that holds organizations accountable for the systems they design and ensures that staff behaviors are responded to fairly and justly."

46.    The Code of Conduct goes on to describe the Company's Compliance Program, explaining that "Acadia is dedicated to adhering to the highest ethical standards and recognizes the importance of full compliance with all applicable federal and state laws, rules, and regulations" and that the Compliance Program is therefore designed to "help[] guide Acadia in its management and operation of compliance-related activities and provide[] guidance to employees on how to perform job responsibilities ethically and legally."

47.    In a section titled "Financial Reporting & Records," the Code of Conduct provides the following, in relevant part:

> We must always keep in mind that individual charges, transactions, and financial entries will ultimately be incorporated into our consolidated financial statements and certified by our company leadership as being accurate. We also present this information to the public and the federal government in accordance with generally accepted accounting principles (GAAP) and other regulations. Anyone who makes or contributes to financial entries, financial reports, and other financial transactions has a special ethical obligation to ensure that the information we provide is accurate and complete. When you sign your annual acknowledgment of the Acadia Code of Conduct as part of your annual Compliance training, you are certifying that you respect the confidentiality of financial and accounting information and promise to proactively promote ethical behavior related to the organization's financial records.

48.    In a section titled "Inside Information, Securities Trading, & Proprietary Information," the Code of Conduct provides the following, in relevant part:

> Inside information, such as financial and operating data (before it is publicly

released), marketing plans, or other business material is nonpublic information. Inside information should only be shared with people inside the organization whose jobs require the information. Employees who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conducting of our business. All nonpublic information about the company or any company with which we do business should be considered confidential information. To use nonpublic information for personal financial benefit or to "tip" others who might make an investment decision based on this information is not only unethical but also illegal. If you have any questions, please consult the Legal Department.

## THE CODE OF ETHICS FOR SENIOR FINANCIAL OFFICERS

49.     Acadia also maintains a Code of Ethics for Senior Financial Officers (the "Code of Ethics"). The Code of Ethics explains that it provides "additional specific requirements" that must be adhered to by the Company's Senior Financial Officers, which it defines as the CEO, CFO, and "the principal accounting officer or controller and all persons performing similar functions." The additional requirements are as follows:

1. All Senior Financial Officers are responsible for full, fair, accurate, timely and understandable disclosure in the periodic reports required to be filed by the Company with the Securities and Exchange Commission (the "SEC"). Accordingly, it is the responsibility of each Senior Financial Officer promptly to bring to the attention of the Board of Directors or the Audit and Risk Committee of the Company any material information of which he or she may become aware that affects the accuracy, completeness and fairness of any disclosures made by the Company in its public filings and to otherwise assist the Board of Directors and the Audit and Risk Committee to fulfill their responsibilities.

2. Each Senior Financial Officer shall promptly bring to the attention of the CFO or General Counsel and the Board of Directors or the Audit and Risk Committee any information he or she may have concerning (a) deficiencies in the design or operation of internal controls that could materially adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a role in the Company's financial reporting, disclosure preparation or internal controls.

3. Each Senior Financial Officer shall promptly bring to the attention of the General Counsel and the Board of Directors or the Audit and Risk Committee any information he or she may have concerning any violation of the Code of Conduct, including any actual or apparent conflicts of interest between personal

13

and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

4. Each Senior Financial Officer shall promptly bring to the attention of the General Counsel and the Board of Directors or the Audit and Risk Committee any information he or she may have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent of the Company, or of violations of the Code of Conduct or of this Code of Ethics.

5. The Board of Directors (or a designated committee of the Board of Directors) shall determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of violations of the Code of Conduct or of this Code of Ethics by a Senior Financial Officer. Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to the Code of Conduct and to this Code of Ethics, and shall include written notices to the individual involved that the Board of Directors (or a designated committee of the Board of Directors) has determined that there has been a violation, censure by the Board of Directors (or by a designated committee of the Board of Directors), demotion or re-assignment of the individual involved, suspension with or without pay or benefits and termination of the individual's employment or such other action as the Board of Directors (or a designated committee of the Board of Directors) may determine is appropriate under the circumstances. In determining what action is appropriate in a particular case, the Board of Directors (or a designated committee of the Board of Directors) or such designee shall take into account all relevant information, including the nature and severity of the violation, whether the violation was a single occurrence or series of occurrences, whether the violation appears to have been intentional or inadvertent, whether the individual in question had been advised prior to the violations of the proper course of action and whether the individual in question had committed other violations in the past.

6. Each Senior Financial Officer will annually sign an attestation form indicating compliance with this Code of Ethics policy.

## THE AUDIT AND RISK COMMITTEE CHARTER

50.     Acadia maintains an Audit and Risk Committee Charter (the "Charter") that states

that the purpose of the Audit and Risk Committee is to:

(i) assist the Board in its oversight of (A) the quality and integrity of the Company's financial statements, (B) the Company's accounting and reporting policies and procedures, (C) the Company's compliance with legal and regulatory requirements that may have a material impact on the Company's financial statements, (D) the

14

qualifications, independence and performance of the Company's external auditor (the "Independent Auditor"), (E) the Company's disclosure controls and procedures, (F) the Company's internal control over financial reporting and (G) the Company's enterprise risk assessment and risk management system; (ii) provide the Board with the results of the Committee's monitoring and recommendations derived therefrom; (iii) prepare the report of the Committee required to be included in the Company's annual report or proxy statement; and (iv) provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

51.　In a section titled "Duties and Responsibilities," the Charter provides the following,

in relevant part:

**Accounting and Financial Reporting**

8.  Review and discuss reports from the Independent Auditor on (i) all critical accounting policies and practices used by the Company, (ii) alternative treatments of financial information within GAAP related to material items that have been discussed with management, including the ramifications of the use of the alternative treatments and the treatment preferred by the Independent Auditor, (iii) management letters or internal control reports prepared by the Independent Auditor and any related management responses, (iv) any significant difficulties encountered during the course of the audit, including any restrictions on the scope of the Independent Auditor's activities or on access to requested information, and any significant disagreements with management, (v) material written communications between the Independent Auditor and management (including schedules of unadjusted differences), and (vi) applicable laws, rules, listing standards and any requirements of or policies adopted by the Public Company Accounting Oversight Board.

9.  Annually obtain from the Independent Auditor a report on compliance with Section 10A of the Exchange Act, containing assurance that the annual audit was conducted in a manner consistent with Section 10A of the Exchange Act.

10.  Review and discuss with management and the Independent Auditor the annual audited financial statements and quarterly unaudited financial statements to be included in the Company's Annual Report on Form 10-K or Quarterly Reports on Form 10-Q, as appropriate, including the disclosures under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operation," and receive reports from the Independent Auditor in connection therewith as required by applicable SEC rules and professional standards.

11.  Recommend to the Board, based on the foregoing review and discussion, whether the annual audited financial statements should be included in the Company's Annual Report on Form 10K.

12. Periodically review the significant accounting principles, policies and practices followed by the Company in accounting for and reporting its financial results of operations in accordance with GAAP.

13. Review and discuss with management, if appropriate, material changes to the Company's accounting principles and practices as suggested by the Independent Auditor, the internal auditor, or management.

14. Periodically discuss with management, the internal auditor and the Independent Auditor the effect (or anticipated effect) of new and proposed regulatory and accounting policies and initiatives.

15. Periodically review reports from inside and outside legal counsel and others regarding any legal, regulatory and other matters that may have a material effect on the Company's financial statements.

16. Review annually the effect of off-balance sheet arrangements, if any, on the Company's financial statements.

17. Prepare any reports that are required to be included in the Company's proxy statement and review any disclosures to be made by the Company regarding audit and non-audit services provided by the Independent Auditor.

**Internal Control**

18. Review on a continuing basis (i) the adequacy and effectiveness of the Company's system of internal control over financial reporting (including any material weaknesses and significant deficiencies) and (ii) any significant changes in such internal control over financial reporting that is reported to the Committee by the Independent Auditor, the internal auditor or management. Such review shall include meeting periodically with the Company's management, the internal auditor, and the Independent Auditor to review their respective assessment of the adequacy of such internal controls.

19. Review any reports by management or the internal auditor regarding the effectiveness of, or any deficiencies in, the design or operation of the Company's internal control over financial reporting and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control.

20. Review and discuss disclosures made by the CEO and CFO in connection with the certification of the Company's annual and quarterly reports and the matters covered by such disclosures.

21. Institute special investigations with full access to all books, records, facilities and

16

personnel of the Company, when the Committee, in its sole discretion deems such an investigation is necessary.

*　　*　　*

**Risk Assessment and Management**

25. Review and discuss with management the Company's major financial and enterprise risk exposures including without limitation with respect to the Company's accounting and financial reporting policies and procedures, risk management protocols, compliance programs and the measures management has taken to mitigate risk.

26. Review with management the risk management process and analysis completed to identify, prioritize, monitor, measure and control such exposures and elicit recommendations for the improvement of the Company's risk assessment and mitigation procedures

27. Review reports from management, the Independent Auditor, the Compliance Committee, legal counsel and outside experts regarding the Company's enterprise risk exposures to ensure that the Committee monitors key corporate risks on an ongoing basis.

28. Review the Company's disclosure of risk factors in filings with the Securities and Exchange Commission.

29. Report to the full Board a summary of the activities of the Committee relating to enterprise risk management oversight and provide an opportunity for a discussion of the most significant risks and related matters.

## <u>SUBSTANTIVE ALLEGATIONS</u>

22.　　The Relevant Period begins on February 28, 2020, when the Company filed its Annual Report on Form 10-K with the SEC (the "2019 10-K"). The 2019 10-K was signed by Defendants Osteen, Duckworth, Waud, Bernhard, Bissell, Gregg, Grieco, and Miquelon. Appended to the 2019 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Osteen and Duckworth, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

17

23.     The 2019 10-K described Acadia's "Acute Inpatient Psychiatric Facilities" as "facilities [that] provide a high level of care in order to stabilize patients that are either a threat to themselves or to others." The 2019 10-K also stated that "[l]engths of stay for crisis stabilization and acute care range from three to five days and from five to twelve days, respectively."

24.     The 2019 10-K reported that "same facility revenue increased by $106.7 million, or 5.8%," compared to the prior year, "*resulting from same facility growth in patient days of 3.2% and an increase in same facility revenue per day of 2.5%*."[1] The Company stated that the growth in same facility patient days resulted from the "*ongoing demand for our services*."

25.     The 2019 10-K contained the following risk disclosure:

An incident involving one or more of our patients or the failure by one or more of our facilities to provide appropriate care could result in increased regulatory burdens, governmental investigations, negative publicity and adversely affect the trading price of our common stock.

Because many of the patients we treat suffer from severe mental health and chemical dependency disorders, patient incidents, including deaths, sexual abuse, assaults and elopements, occur from time to time. *If one or more of our facilities experiences an adverse patient incident or is found to have failed to provide appropriate patient care, an admissions hold, loss of accreditation, license revocation or other adverse regulatory action could be taken against us. Any such patient incident or adverse regulatory action could result in governmental investigations, judgments or fines and have a material adverse effect on our business, financial condition and results of operations.* In addition, we have been and could become the subject of negative publicity or unfavorable media attention, whether warranted or unwarranted, that could have a significant, adverse effect on the trading price of our common stock or adversely impact our reputation and how our referral sources and payors view us.

We have been and could become the subject of governmental investigations, regulatory actions and whistleblower lawsuits.

Healthcare companies in both the U.S. and the U.K. may be subject to investigations by various governmental agencies. Certain of our individual facilities have received, and from time to time, other facilities may receive, subpoenas, civil investigative demands, audit reports and other inquiries from, and may be subject to investigation by, federal and state agencies and regulatory agencies in the U.K.

---

[1] All emphasis added, unless otherwise noted.

18

See "Item 3. Legal Proceedings" for additional information about pending investigations. These investigations can result in repayment obligations, and violations of the False Claims Act can result in substantial monetary penalties and fines, the imposition of a corporate integrity agreement and exclusion from participation in governmental health programs. If we incur significant costs responding to or resolving these or future inquiries or investigations, our business, financial condition and results of operations could be materially adversely affected.

*    *    *

We may be subject to liabilities from claims brought against us or our facilities.

***We are subject to medical malpractice lawsuits and other legal actions in the ordinary course of business. Some of these actions may involve large claims, as well as significant defense costs***. We cannot predict the outcome of these lawsuits or the effect that findings in such lawsuits may have on us. All professional and general liability insurance we purchase is subject to policy limitations and in some cases, an insurance company may defend us subject to a reservation of rights. Management believes that, based on our past experience and actuarial estimates, our insurance coverage is adequate considering the claims arising from the operations of our facilities. While we continuously monitor our coverage, our ultimate liability for professional and general liability claims could change materially from our current estimates. If such policy limitations should be partially or fully exhausted in the future, or payments of claims exceed our estimates or are not covered by our insurance, it could have a material adverse effect on our business, financial condition or results of operations. Further, insurance premiums have increased year over year and insurance coverage may not be available at a reasonable cost, especially given the significant increase in insurance premiums generally experienced in the healthcare industry.

26.     On March 3, 2020, during the Acadia Healthcare Company, Inc. at Raymond James Institutional Investors Conference, Defendant Osteen discussed the Company's "acute business," stating that the business line has "***had a very stable length of stay . . . about 9 days, and that really has not changed over the last 4 years***." Defendant Osteen went on to state that the Company had "***consistent high quality across our acute service line***" and touted the acute service line's "***broad base of referrals***" to generate additional revenue.

27.     On October 29, 2020, Acadia issued a press release (the "October 2020 Press Release") announcing its financial results for the third quarter of 2020. In the press release, Defendant Osteen touted Acadia's performance for the quarter, stating:

19

We are pleased with our financial and operating performance for the third quarter, reflecting strong demand for our behavioral health services. The ongoing challenges and uncertainties related to the COVID-19 global pandemic have had a profound impact on everyone's lives, especially for the more vulnerable populations served by Acadia.

28.     The October 2020 Press Release also contained the following quote from Defendant Osteen regarding Acadia's efforts in providing quality care to its patients:

We commend the work of our dedicated employees across our operations, who have worked hard to meet this demand and provide quality care in a safe environment We expect demand for our services will continue to increase as the mental and emotional toll caused by economic and societal concerns persists and more individuals across our markets look to Acadia for the highest quality of patient care.

29.     On October 30, 2020, Acadia hosted an earnings call, during which Defendant Osteen attributed Acadia's financial performance to demand for its behavioral health services, stating:

During the third quarter, we experienced strong top line growth, with revenues up 7.2% over the prior year, reflecting robust demand for our behavioral health services. . . . We have a resilient business model that can respond to a rapidly changing environment. Acadia is well positioned to address the needs of those seeking treatment for mental health and substance use issues. And we expect that demand for our services will continue to increase.

30.     During the same earnings call, Defendant Osteen continued to tout Acadia's "robust demand [that] is demonstrated by our increase in same-facility patient days of 4.2% compared to the prior year," and that "[w]ithin our acute service line, we have seen solid volumes attributable to our deep network of referral sources. Our teams work closely with our patients, their families and referral sources to reinforce the message that we have the expertise and capacity to help."

31.     On February 26, 2021, the Company filed its Annual Report on Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K was signed by Defendants Osteen, Duckworth, Waud, Bernhard, Bissell, Gregg, Grieco, Fucci, and Miquelon. Appended to the 2020 10-K were SOX certifications, signed by Defendants Osteen and Duckworth, attesting to the accuracy of financial

20

reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

32.     The 2020 10-K contained the following risk disclosure:

An incident involving one or more of our patients or the failure by one or more of our facilities to provide appropriate care could result in increased regulatory burdens, governmental investigations, negative publicity and adversely affect the trading price of our common stock.

Because many of the patients we treat suffer from severe mental health and chemical dependency disorders, patient incidents, including deaths, sexual abuse, assaults and elopements, occur from time to time. *If one or more of our facilities experiences an adverse patient incident or is found to have failed to provide appropriate patient care, an admissions hold, loss of accreditation, license revocation or other adverse regulatory action could be taken against us. Any such patient incident or adverse regulatory action could result in governmental investigations, judgments or fines and have a material adverse effect on our business, financial condition and results of operations*. In addition, we have been and could become the subject of negative publicity or unfavorable media attention, whether warranted or unwarranted, that could have a significant, adverse effect on the trading price of our common stock or adversely impact our reputation and how our referral sources and payors view us.

                    *        *        *

We care for a large number of vulnerable individuals with complex needs and any care quality deficiencies could adversely impact our brand, reputation and ability to market our services effectively.

*Our future growth will partly depend on our ability to maintain our reputation for providing quality patient care and, through new programs and marketing activities, increased demand for our services*. Factors such as increased acuity of our patients, *health and safety incidents at our facilities, regulatory enforcement actions, negative press or general customer dissatisfaction could lead to deterioration in the level of our quality ratings or the public perception of the quality of our services (including as a result of negative publicity about our industry generally), which in turn could lead to a loss of patient placements, referrals and self-pay patients or service users*. Any impairment of our reputation, loss of goodwill or damage to the value of our brand name could have a material adverse effect on our business, results of operations and financial condition.

*Many of our service users have complex medical conditions or special needs, are vulnerable and often require a substantial level of care and supervision*. There is a risk that one or more service users could be harmed by one or more of our employees, either intentionally, through negligence or by accident. Further,

21

individuals cared for by us have in the past engaged, and may in the future engage, in behavior that results in harm to themselves, our employees or to one or more other individuals, including members of the public. *A serious incident involving harm to one or more service users or other individuals could result in negative publicity*. Such negative publicity could have a material adverse effect on our brand, reputation and ADC, which would have a corresponding negative impact on our business, results of operations and financial condition. Furthermore, the damage to our reputation or to the reputation of the relevant facility from any such incident could be exacerbated by any failure on our part to respond effectively to such incident.

*     *     *

We are and in the future could become the subject of additional governmental investigations, regulatory actions and whistleblower lawsuits.

Healthcare companies in the U.S. may be subject to investigations by various governmental agencies. *Certain of our individual facilities have received, and from time to time, other facilities may receive, subpoenas, civil investigative demands, audit reports and other inquiries from, and may be subject to investigation by, federal and state agencies*. See Note 17— Commitments and Contingencies in the accompanying notes to our consolidated financial statements beginning on Page F-1 of this Annual Report on Form 10-K for additional information about pending investigations. These investigations can result in repayment obligations, and violations of the False Claims Act can result in substantial monetary penalties and fines, the imposition of a corporate integrity agreement and exclusion from participation in governmental health programs. *If we incur significant costs responding to or resolving these or future inquiries or investigations, our business, financial condition and results of operations could be materially adversely affected*.

*     *     *

We are and in the future may become involved in legal proceedings based on negligence or breach of a contractual or statutory duty from service users or their family members or from employees or former employees.

*From time to time, we are subject to complaints and claims from service users and their family members alleging professional negligence, medical malpractice or mistreatment. We are also subject to claims for unlawful detention from time to time when patients allege they should not have been detained under applicable laws and regulations or where the appropriate procedures were not correctly followed*.

*     *     *

22

The incurrence of substantial legal fees, damage awards or other fines as well as the potential impact on our brand or reputation as a result of being involved in any legal proceedings could have a material adverse impact on our business, results of operations and financial condition.

33.     On March 1, 2022, the Company filed its Annual Report on Form 10-K with the SEC (the "2021 10-K"). The 2021 10-K was signed by Defendants Osteen, Duckworth, Waud, Bernhard, Bissell, Fucci, Gregg, Grieco, and Miquelon. Attached to the 2021 10-K were certifications pursuant to SOX signed by Defendants Osteen and Duckworth attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

34.     The 2021 10-K contained the following risk disclosure:

An incident involving one or more of our patients or the failure by one or more of our facilities to provide appropriate care could result in increased regulatory burdens, governmental investigations, negative publicity and adversely affect the trading price of our common stock.

Because many of the patients we treat suffer from severe mental health and chemical dependency disorders, patient incidents, including deaths, sexual abuse, assaults and elopements, occur from time to time. ***If one or more of our facilities experiences an adverse patient incident or is found to have failed to provide appropriate patient care, an admissions hold, loss of accreditation, license revocation or other adverse regulatory action could be taken against us. Any such patient incident or adverse regulatory action could result in governmental investigations, judgments or fines and have a material adverse effect on our business, financial condition and results of operations***. In addition, we have been and ***could become the subject of negative publicity or unfavorable media attention***, whether warranted or unwarranted, that could have a significant, adverse effect on the trading price of our common stock or adversely impact our reputation and how our referral sources and payors view us.

*            *            *

We care for a large number of vulnerable individuals with complex needs and any care quality deficiencies could adversely impact our brand, reputation and ability to market our services effectively.

***Our future growth will partly depend on our ability to maintain our reputation for providing quality patient care and, through new programs and marketing activities, increased demand for our services***. Factors such as increased acuity of

23

our patients, *health and safety incidents at our facilities, regulatory enforcement actions, negative press or general customer dissatisfaction could lead to deterioration in the level of our quality ratings or the public perception of the quality of our services (including as a result of negative publicity about our industry generally), which in turn could lead to a loss of patient placements, referrals and self-pay patients or service users*. Any impairment of our reputation, loss of goodwill or damage to the value of our brand name could have a material adverse effect on our business, results of operations and financial condition.

*Many of our service users have complex medical conditions or special needs, are vulnerable and often require a substantial level of care and supervision*. There is a risk that one or more service users could be harmed by one or more of our employees, either intentionally, through negligence or by accident. Further, individuals cared for by us have in the past engaged, and may in the future engage, in behavior that results in harm to themselves, our employees or to one or more other individuals, including members of the public. *A serious incident involving harm to one or more service users or other individuals could result in negative publicity. Such negative publicity could have a material adverse effect on our brand, reputation and ADC, which would have a corresponding negative impact on our business, results of operations and financial condition*. Furthermore, the damage to our reputation or to the reputation of the relevant facility from any such incident could be exacerbated by any failure on our part to respond effectively to such incident.

\*     \*     \*

We are and in the future could become the subject of additional governmental investigations, regulatory actions and whistleblower lawsuits.

*Healthcare companies in the U.S. may be subject to investigations by various governmental agencies. Certain of our individual facilities have received, and from time to time, other facilities may receive, subpoenas, civil investigative demands, audit reports and other inquiries from, and may be subject to investigation by, federal and state agencies*. See Note 20— Commitments and Contingencies in the accompanying notes to our consolidated financial statements beginning on Page F-1 of this Annual Report on Form 10-K for additional information about pending investigations. These investigations can result in repayment obligations, and violations of the False Claims Act can result in substantial monetary penalties and fines, the imposition of a corporate integrity agreement and exclusion from participation in governmental health programs. *If we incur significant costs responding to or resolving these or future inquiries or investigations, our business, financial condition and results of operations could be materially adversely affected*.

\*     \*     \*

24

We are and in the future may become involved in legal proceedings based on negligence or breach of a contractual or statutory duty from service users or their family members or from employees or former employees.

*From time to time, we are subject to complaints and claims from service users and their family members alleging professional negligence, medical malpractice or mistreatment. We are also subject to claims for unlawful detention from time to time when patients allege they should not have been detained under applicable laws and regulations or where the appropriate procedures were not correctly followed.*

\*     \*     \*

The incurrence of substantial legal fees, damage awards or other fines as well as the potential impact on our brand or reputation as a result of being involved in any legal proceedings could have a material adverse impact on our business, results of operations and financial condition.

35.     On February 28, 2023, the Company filed its Annual Report on Form 10-K with the SEC (the "2022 10-K"). The 2022 10-K was signed by Defendants Osteen, Hunter, Duckworth, Waud, Bernhard, Bissell, Fucci, Gregg, Grieco, Kelly, and Miquelon. Appended to the 2022 10-K were certifications pursuant to SOX signed by Defendants Hunter and Duckworth attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

36.     The 2022 Annual Report contained the following risk disclosure:

An incident involving one or more of our patients or the failure by one or more of our facilities to provide appropriate care could result in increased regulatory burdens, governmental investigations, negative publicity and adversely affect the trading price of our common stock.

Because many of the patients we treat suffer from severe mental health and chemical dependency disorders, patient incidents, including deaths, sexual abuse, assaults and elopements, occur from time to time. *If one or more of our facilities experiences an adverse patient incident or is found to have failed to provide appropriate patient care, an admissions hold, loss of accreditation, license revocation or other adverse regulatory action could be taken against us. Any such patient incident or adverse regulatory action could result in governmental investigations, judgments or fines and have a material adverse effect on our business, financial condition and results of operations*. In addition, we have been and could become the subject of negative publicity or unfavorable media attention,

25

whether warranted or unwarranted, that could have a significant, adverse effect on the trading price of our common stock or adversely impact our reputation and how our referral sources and payors view us.

*    *    *

We care for a large number of vulnerable individuals with complex needs and any care quality deficiencies could adversely impact our brand, reputation and ability to market our services effectively.

***Our future growth will partly depend on our ability to maintain our reputation for providing quality patient care and, through new programs and marketing activities, increased demand for our services***. Factors such as increased acuity of our patients, ***health and safety incidents at our facilities, regulatory enforcement actions, negative press or general customer dissatisfaction could lead to deterioration in the level of our quality ratings or the public perception of the quality of our services (including as a result of negative publicity about our industry generally), which in turn could lead to a loss of patient placements, referrals and self-pay patients or service users***. Any impairment of our reputation, loss of goodwill or damage to the value of our brand name could have a material adverse effect on our business, results of operations and financial condition.

Many of our service users have complex medical conditions or special needs, are vulnerable and often require a substantial level of care and supervision. ***There is a risk that one or more service users could be harmed by one or more of our employees, either intentionally, through negligence or by accident***. Further, individuals cared for by us have in the past engaged, and may in the future engage, in behavior that results in harm to themselves, our employees or to one or more other individuals, including members of the public. ***A serious incident involving harm to one or more service users or other individuals could result in negative publicity. Such negative publicity could have a material adverse effect on our brand, reputation and ADC, which would have a corresponding negative impact on our business, results of operations and financial condition. Furthermore, the damage to our reputation or to the reputation of the relevant facility from any such incident could be exacerbated by any failure on our part to respond effectively to such incident***.

*    *    *

We are and in the future could become the subject of additional governmental investigations, regulatory actions and whistleblower lawsuits.

***Healthcare companies in the U.S. may be subject to investigations by various governmental agencies. Certain of our individual facilities have received, and from time to time, other facilities may receive, subpoenas, civil investigative demands, audit reports and other inquiries from, and may be subject to investigation by, federal and state agencies***. See Note 20— Commitments and

26

Contingencies in the accompanying notes to our consolidated financial statements beginning on Page F-1 of this Annual Report on Form 10-K for additional information about pending investigations. These investigations can result in repayment obligations, and violations of the False Claims Act can result in substantial monetary penalties and fines, the imposition of a corporate integrity agreement and exclusion from participation in governmental health programs. *If we incur significant costs responding to or resolving these or future inquiries or investigations, our business, financial condition and results of operations could be materially adversely affected*.

*       *       *

We are and in the future may become involved in legal proceedings based on negligence or breach of a contractual or statutory duty from service users or their family members or from employees or former employees.

*From time to time, we are subject to complaints and claims from service users and their family members alleging professional negligence, medical malpractice or mistreatment. We are also subject to claims for unlawful detention from time to time when patients allege they should not have been detained under applicable laws and regulations or where the appropriate procedures were not correctly followed*.

*       *       *

The incurrence of substantial legal fees, damage awards or other fines as well as the potential impact on our brand or reputation as a result of being involved in any legal proceedings could have a material adverse impact on our business, results of operations and financial condition.

37.     On February 28, 2024, the Company filed its Annual Report on Form 10-K with the SEC (the "2023 10-K"). The 2023 10-K was signed by Defendants Osteen, Hunter, Dixon, Waud, Bernhard, Bissell, Fucci, Gregg, Grieco, Kelly, and Miquelon. Appended to the 2023 10-K were certifications pursuant to SOX signed by Defendants Hunter and Dixon attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

38.     The 2023 10-K contained the following risk disclosures:

An incident involving one or more of our patients or the failure by one or more of our facilities to provide appropriate care could result in increased regulatory burdens, governmental investigations, litigation, negative publicity and adversely affect the trading price of our common stock.

Because many of the patients we treat suffer from severe mental health and chemical dependency disorders, patient incidents, including deaths, sexual abuse, assaults and elopements, have occurred in the past and could continue to occur in the future. *As a result of adverse patient incidents, we have experienced admissions holds, adverse regulatory action, civil litigation, negative publicity and negative impacts on referrals. If one or more of our facilities experiences an adverse patient incident in the future or is found to have failed to provide appropriate patient care, an admissions hold, loss of accreditation, license revocation or other adverse regulatory action could be taken against us*. Any such patient incident or adverse regulatory action could result in governmental investigations, judgments or fines and have a material adverse effect on our business, financial condition and results of operations. In addition, we have been and could become the subject of negative publicity or unfavorable media attention, whether warranted or unwarranted, that could have a significant, adverse effect on the trading price of our common stock or adversely impact our reputation and how our referral sources and payors view us.

*                 *                 *

We care for a large number of vulnerable individuals with complex needs and any care quality deficiencies could adversely impact our brand, reputation and ability to market our services effectively.

*Our future growth will partly depend on our ability to maintain our reputation for providing quality patient care and, through new programs and marketing activities, increased demand for our services. Factors such as increased acuity of our patients, health and safety incidents at our facilities, regulatory enforcement actions, negative press, civil liability or general customer dissatisfaction could lead to deterioration in the level of our quality ratings or the public perception of the quality of our services (including as a result of negative publicity about our industry generally), which in turn could lead to a loss of patient placements, referrals and self-pay patients or service users*. Any impairment of our reputation, loss of goodwill or damage to the value of our brand name could have a material adverse effect on our business, results of operations and financial condition.

Many of our service users have complex medical conditions or special needs, are vulnerable and often require a substantial level of care and supervision. Our service users have in the past been harmed by one or more of our employees, and could in the future be harmed by our employees, either intentionally, through negligence or by accident. Further, individuals cared for by us have in the past engaged, and may in the future engage, in behavior that results in harm to themselves, our employees or to one or more other individuals, including members of the public. A serious

28

incident involving harm to one or more service users or other individuals could result in negative publicity. Such negative publicity could have a material adverse effect on our brand, reputation and ADC, which would have a corresponding negative impact on our business, results of operations and financial condition. ***Furthermore, the damage to our reputation or to the reputation of the relevant facility from any such incident could be exacerbated by any failure on our part to respond effectively to such incident***.

*     *     *

We are and in the future could become the subject of additional governmental investigations, regulatory actions and whistleblower lawsuits.

***Healthcare companies in the U.S. may be subject to investigations by various governmental agencies. Certain of our individual facilities have received, and from time to time, other facilities may receive, subpoenas, civil investigative demands, audit reports and other inquiries from, and may be subject to investigation by, federal and state agencies***. See Note 11 — Commitments and Contingencies in the accompanying notes to our consolidated financial statements beginning on Page F-1 of this Annual Report on Form 10-K for additional information about pending investigations. These investigations can result in repayment obligations, and violations of the False Claims Act can result in substantial monetary penalties and fines, the imposition of a corporate integrity agreement and exclusion from participation in governmental health programs. ***If we incur significant costs responding to or resolving these or future inquiries or investigations, our business, financial condition and results of operations could be materially adversely affected***.

*     *     *

We are and in the future may become involved in legal proceedings based on negligence or breach of a contractual or statutory duty from service users or their family members or from employees or former employees.

***We have been in the past and will continue in the future to be subject to complaints and claims from service users and their family members alleging professional negligence, medical malpractice or mistreatment***. ***We are also subject to claims for unlawful detention from time to time when patients allege they should not have been detained under applicable laws and regulations or where the appropriate procedures were not correctly followed***. Similarly, we have been in the past and will continue in the future to be subject to substantial claims from employees in respect of personal injuries sustained in the performance of their duties. Current or former employees may also make claims against us in relation to breaches of employment laws. There may also be safeguarding incidents at our facilities which, depending on the circumstances, may result in custodial sentences or other criminal sanctions for the member of staff involved.

29

*     *     *

The incurrence of substantial legal fees, damage awards or other fines as well as the potential impact on our brand or reputation as a result of being involved in any legal proceedings could have a material impact on our business, results of operations and financial condition.

39.     The foregoing statements were materially false and/or misleading and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects. Specifically, the Individual Defendants caused the Company to fail to disclose that: (1) Acadia admitted patients and held them against their will and beyond the length of time that was medically necessary in order to deceive payors into continuing to pay for such patients' care; (2) Acadia would not release patients until their insurance ran out; (3) in order to achieve the above, Acadia deployed Company assessors to pressure hospitals to send patients to Company facilities, filed frivolous petitions with courts to delay patients' release, and directed employees to use buzzwords and avoid using other words in patients' charts to create a false impression of patients' mental state; (4) Acadia's admissions, length of stay, and billing practices would subject the Company to government investigations and actions and heightened media scrutiny; (5) in light of such government investigations and actions and media scrutiny, Acadia's relationships with its referral sources would be negatively impacted; (6) as a result of the above, Acadia experienced slower same-store patient volumes, and in turn, the Company would be forced to lower its full-year 2024 outlook; and (7) as a result of the above, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**THE TRUTH BEGINS TO EMERGE**

40.     On September 1, 2024, *The New York Times* published an article entitled "How a Leading Chain of Psychiatric Hospitals Traps Patients" (the "September 2024 Article").

30

41.     The September 2024 Article noted that Acadia is "one of America's largest chains of psychiatric hospitals" and that "[s]ince the pandemic exacerbated a national mental health crisis, the company's revenue has soared." However, the Article stated that Times' "investigation found that some of that success was built on a disturbing practice: *Acadia has lured patients into its facilities and held them against their will, even when detaining them was not medically necessary*."

42.     The September 2024 Article stated that "[i]n at least 12 of the 19 states where Acadia operates psychiatric hospitals, *dozens of patients, employees and police officers have alerted the authorities that the company was detaining people in ways that violated the law*[.] In some cases, judges have intervened to force Acadia to release patients."

43.     The September 2024 Article stated that "[s]ome patients arrived at emergency rooms seeking routine mental health care, only to find themselves sent to Acadia facilities and locked in."

44.     The September 2024 Article stated the following:

A social worker spent six days inside an Acadia hospital in Florida after she tried to get her bipolar medications adjusted. A woman who works at a children's hospital was held for seven days after she showed up at an Acadia facility in Indiana looking for therapy. And after police officers raided an Acadia hospital in Georgia, 16 patients told investigators that they had been kept there "with no excuses or valid reason," according to a police report.

*Acadia held all of them under laws meant for people who pose an imminent threat to themselves or others.* But none of the patients appeared to have met that legal standard, according to records and interviews.

45.     The September 2024 Article noted that "[m]ost doctors agree that people in the throes of a psychological crisis must sometimes be detained against their will to stabilize them and prevent harm. These can be tough calls, balancing patients' safety with their civil rights."

46.     In contrast to legitimate medical reasons to detain a patient against his or her will,

31

however, the Article noted that "***at Acadia, patients were often held for financial reasons rather than medical ones, according to more than 50 current and former executives and staff members***."

47.     The September 2024 Article stated the following:

> ***Acadia, which charges $2,200 a day for some patients, at times deploys an array of strategies to persuade insurers to cover longer stays, employees said. Acadia has exaggerated patients' symptoms***. It has tweaked medication dosages, then claimed patients needed to stay longer because of the adjustment. And it has argued that patients are not well enough to leave because they did not finish a meal.
>
> ***Unless the patients or their families hire lawyers, Acadia often holds them until their insurance runs out.***

48.     The September 2024 Article quoted Lexie Reid, who is described as a "psychiatric nurse who worked at an Acadia facility in Florida from 2021 to 2022", as saying that ***"[w]e were keeping people who didn't need to be there***[.]"

49.     The September 2024 Article stated the following about conditions and safety at Acadia facilities:

> Every day spent in a psychiatric hospital can be a trial. At Acadia facilities around the country, health inspectors have found that some patients ***did not receive therapy, were unsupervised or were denied access to vital medications. Many inspection reports described rapes, assaults and filthy conditions***.

50.     The September 2024 Article stated the following about Acadia's relationship with emergency rooms, and how Acadia pressures emergency room staff to send patients to its facilities, even if that may not be the best choice for the patient:

> Acadia also pitches itself to staff in hospital emergency rooms that have been inundated with patients seeking mental health care. Business-development teams make sales calls to the doctors and other hospital workers, passing out brochures and talking up the expertise of Acadia's staff and its willingness to take difficult patients. Sometimes, they come bearing doughnuts.
>
> In a few states, Acadia has dispatched teams to overwhelmed E.R.s to help them determine whether patients need to be hospitalized. ***These employees, known as***

32

*assessors, are supposed to be objective. But several said Acadia scolded them when they suggested that patients be sent to other psychiatric hospitals*.

*      *      *

LeDesha Haynes, a former human resources director at Lakeview Behavioral Health Hospital, an Acadia facility in Georgia, said that when the hospital had empty beds, "the assessors were always being pressured and told to beat the bushes." She added, "Their judgment was clouded."

51.    The September 2024 Article stated that *the New York Times* had "identified eight instances of Acadia's holding people who had voluntarily checked themselves in but then changed their minds."

52.    Regarding these eight cases, the Article stated the following:

One of those patients was the hospital worker in Indiana, who asked for anonymity because she didn't want her health issues made public. She sought treatment at an Acadia hospital in Indianapolis, *but was then held against her will when she asked to leave, according to a complaint filed with the sate's attorney general. She was released after her father went to court*.

Another was a retired city employee, who asked The Times to identify her by her initials, T.B. In March 2021, she was feeling depressed and went to her doctor's office to get a therapist recommendation. A nurse there provided her several options, including visiting Park Royal in Fort Myers, Fla., an Acadia hospital near her home. *She said an employee at Park Royal had told her that in order to get therapy, she would have to sign herself in. She arranged for her husband to pick her up that evening from the hospital.*

But when T.B. tried to leave, Park Royal refused; it let her out six days later, after her husband went to court and a judge ordered her to be released.

53.    The September 2024 Article stated the following regarding Acadia's efforts to deceive insurers into thinking that holding patients against their will is medically necessary:

Once Acadia gets patients in the door, it often tries to hold them until their insurance runs out.

*Acadia goes to great lengths to convince insurers that the patients should stay as long as possible, often around five days.*

*To do that, Acadia needs to show that patients are unstable and require ongoing intensive care. Former Acadia executives and staff in 10 states said employees*

33

*were coached to use certain buzzwords, like "combative," in patients' charts to make that case.*

*In 2022, for example, state inspectors criticized an Acadia hospital in Reading, Pa., for having instructed workers to avoid adjectives like "calm" and "compliant" in a patient's chart*. That same year, employees at Acadia hospitals in Ohio and Michigan complained to their state regulators that doctors had written false statements in patients' medical charts to justify continuing their stays.

At an Acadia hospital in Missouri, three former nurses said, *executives pressured them to label patients whose insurance was about to run out as uncooperative. Acadia employees then would argue to insurance companies that the patients weren't ready to leave*. Sometimes, the nurses said, they wrote patients up for not finishing a meal or skipping group therapy.

54.     The September 2024 Article stated that "[o]nce Acadia won more insurance days for patients, *it often would not release them before their insurance ran out, according to dozens of former Acadia executives, psychiatrists and other staff members*."

55.     The September 2024 Article quoted Jessie Roeder, who was described as a "top executive at two Acadia hospitals in Florida in 2018 and 2019" as saying "*[i]f there were insurance days left, that patient was going to be held*[.]"

56.     The September 2024 Article stated the following about Acadia's efforts to work around state laws mandating a maximum number of days a patient can legally be involuntarily held:

Under state laws, patients generally must pose an imminent threat to themselves or others in order to be held against their will in a psychiatric facility. Even then, hospitals can hold people for just a handful of days, unless the patients agree to stay longer or a judge or a medical professional determines that they are not ready to leave.

*In Florida, the limit for holding patients against their will is 72 hours. To extend that time, hospitals have to get court approval*.

*Acadia's North Tampa Behavioral Health Hospital found a way to exploit that, current and former employees said*.

*From 2019 to 2023, North Tampa filed more than 4,500 petitions to extend patients' involuntary stays, according to a Times analysis of court records*. Simply

34

filing a petition allowed the hospital to legally hold the patients — and bill their insurance — until the court date, which can be several days after the petition is filed.

57.     The September 2024 Article then noted that "[j]udges granted only 54 of North

Tampa's petitions, *or about 1% of the total*."

58.     The September 2024 Article stated the following about one instance of a patient

being held against her will:

> Kathryn MacKenzie, a school social worker, had recently moved to Tampa and didn't yet have a local psychiatrist. ***In August 2020, she visited an emergency room to have her prescriptions for bipolar disorder evaluated***. An E.R. doctor sent her to North Tampa Behavioral.
>
> Once there, Ms. MacKenzie was admitted and held against her will, even though her medical records stated that she was not feeling suicidal or wanting to harm others.
>
> ***From the moment she entered the facility, Ms. MacKenzie begged to be released, according to court records and her mother, Jane Robertson***.
>
> "God please connect me back to my mom asap," Ms. MacKenzie wrote in a journal that she kept during her hospitalization and that The Times reviewed. "Every time the locked door open and slam I feel a quick feeling of fear."
>
> Instead of releasing her, the hospital went to court, seeking to extend her stay.
>
> ***While she waited for a hearing, Acadia charged her insurance about $2,200 a day, billing records show. Shortly before the hearing, Acadia agreed to release her. Acadia charged her insurance $13,200 for the six-day stay.***
>
> Ms. Robertson said her daughter has become terrified of seeking help because she fears she could find herself trapped back inside. (Ms. MacKenzie later sued Acadia and reached a confidential settlement.)
>
> The involuntary stays have had lasting effects on other patients, too. One woman in Michigan said in an interview that she had lost her job while detained. A man in Utah said he had become afraid to seek help since being held at an Acadia facility for a week in 2021.

59.     The September 2024 Article then stated that in "December 2019, more than 50

police officers descended on an Acadia psychiatric hospital in an office park 30 minutes north of

35

Atlanta", and that the "police had opened an investigation into the hospital, Lakeview Behavioral Health, after numerous incidents, according to police records."

60.     The September 2024 Article stated that "[t]he previous January, a boy **staying at Lakeview was taken to a nearby emergency room. He had so many bruises that staff suspected child endangerment**." (Emphasis added). A few months later, the Article noted, "**police officers witnessed three Lakeview employees assaulting a patient**. Over the next six months, they **interviewed dozens of patients who said they had been held against their will or had seen patients, including children, being assaulted or neglected**."

61.     The incidents at Lakeview Behavioral Health were not isolated incidents. The September 2024 Article stated that "[h]ealth inspectors nationwide have faulted Acadia for similar problems, including failing to provide adequate medical care and neglecting patients."

62.     The September 2024 Article stated that "Acadia closed its Highland Ridge Hospital in Utah this year **after state regulators investigated reports of dozens of rapes and assaults**." Further, "[i]n 2022, Tennessee inspectors faulted Acadia **for falsely claiming in medical charts that a patient in Memphis had been checked on every 15 minutes. He was found in rigor mortis hours after he died**."

63.     The September 2024 Article stated the following about a woman who, while delusional, was not a harm to herself and others, was held against her will in Georgia after the police raid described above, and how the Company did not have her evaluated by a psychiatrist, in violation of Georgia state law:

> About a year after the raid, Kim Lupton, a wealthy widow who lived on the shore of Lake Oconee in Georgia, arrived at the emergency room of the Piedmont Athens Regional Medical Center. Hours earlier, she said, she had become convinced that someone was trying to poison her. She swam across a narrow inlet to the yard of a neighbor, who called an ambulance.

36

Doctors at Piedmont determined that Ms. Lupton was delusional, but not suicidal or a threat to others, according to her medical records.

But over the next few hours, still at Piedmont, she was seen by assessors employed by Acadia. They recommended that Ms. Lupton be sent to a psychiatric hospital, her records show.

Ms. Lupton said she wanted to go home. Instead, shortly after 11 p.m., she was taken to a van and driven more than an hour to Acadia's Lakeview facility. *Once there, Ms. Lupton was lucid and repeatedly asked to leave, according to her medical records*.

One of Ms. Lupton's friends called a private investigator, Doug McDonald, who eventually showed up at Lakeview with a letter from a lawyer. The letter said Ms. Lupton had not been evaluated by a psychiatrist at Lakeview, in violation of Georgia law.

Lakeview summoned a psychiatrist, who agreed to release her, *according to a lawsuit Ms. Lupton filed against Acadia. She had been there four days*.

Mr. McDonald said that while he was waiting to pick up Ms. Lupton in the parking lot, another woman approached him. Her teenage daughter was stuck inside, too.

64.     On this news, the price of Acadia common stock fell $3.72 per share, or 4.5%, to close at $78.21 per share on September 3, 2024.

65.     Then, on September 27, 2024, before the market opened, Acadia Healthcare filed a current report on Form 8-K with the SEC, stating the following:

> *On September 24, 2024, Acadia Healthcare Company, Inc. ("Acadia") received a voluntary request for information from the United States Attorney's Office for the Southern District of New York as well as a grand jury subpoena from the United States District Court for the Western District of Missouri* (W.D.Mo.) *related to its admissions, length of stay and billing practices*. In addition, Lakeland Hospital Acquisition, LLC, a subsidiary of Acadia, also received a grand jury subpoena from W.D.Mo. *on the same day regarding similar subject matter*. *Acadia anticipates receiving similar document requests from the U.S. Securities and Exchange Commission* and may receive additional document requests from other governmental agencies. Acadia is fully cooperating with authorities and, at this time, cannot speculate on whether the outcome of these investigations will have any impact on its business or operations.

66.     Also on September 27, 2024, the *New York Times* published another article entitled "Acadia Healthcare Says It Faces New Federal Investigations," which reported on the federal

37

investigations into the Company's admissions and billing practices. Despite the recent revelations, the Company continued to deny any wrongdoing: "Acadia also said that the experiences of patients described in the Times article [published on September 1, 2024] were 'completely inconsistent with Acadia's policies' and that 'all decisions on patient care, including whether treatment is necessary and for how long, are made by licensed physicians' and follow the law."

67. On this news, the price of Acadia common stock fell by $12.38 per share, or 16.36%, to close at $63.28 on September 27, 2024.

68. On October 3, 2024, Acadia received a letter from Adam B. Schiff, Judy Chu, and Julia Brownley, members of the U.S. House of Representatives from California, demanding answers to questions raised by the Article, including reports "that inpatient psychiatric facilities owned by Acadia Healthcare have wrongfully detained patients under medically unnecessary circumstances." Among other things, Representatives Schiff, Chu, and Brownley demanded detailed responses from Acadia about: (1) "the standard intake process for patients admitted under emergency hold at Acadia inpatient psychiatric facilities[;]" (2) "the average length for an inpatient stay among patients admitted under an emergency hold[;]" and (3) the "percentage of patients [that] are covered by private health insurance[,] . . . Medicare[,] and Medicaid."

69. As a result of this news, the price of Acadia common stock fell more than 3.5%, from a closing price of $58.80 per share on October 2, 2024, to a closing price of $56.71 per share on October 3, 2024.

70. On October 18, 2024, the *New York Times* published another article entitled "Veterans Dept. Investigating Acadia Healthcare for Insurance Fraud" (the "October 2024 Article"). According to the October 2024 article, the Veterans Affairs Department is investigating whether Acadia "is defrauding government health insurance programs by holding patients longer

38

than is medically necessary[.]" The article explains that "[t]he veterans agency is looking into whether Acadia billed insurance programs for patients who were stable enough to be released and did not need intensive inpatient care, according to three people with knowledge of the inquiry." The article also notes that "[s]everal former Acadia employees in Georgia and Missouri have also recently been interviewed by agents from the F.B.I. and the inspector general's office of the Health and Human Services Department."

71.     As a result of this news, the price of Acadia common stock fell more than 12%, from a closing price of $59.32 per share on October 17, 2024, to a closing price of $52.03 per share on October 18, 2024.

## THE TRUTH EMERGES

72.     The truth was fully revealed on October 30, 2024, when Acadia issued a press release (the "October 2024 Press Release") announcing its financial results for the third quarter of 2024. The October 2024 Press Release disclosed that Acadia had lowered its full-year 2024 revenue outlook to a range of $3.15 to $3.165 billion, below the prior range of $3.18 to $3.23 billion. The Company also lowered its full-year 2024 adjusted EBITDA to a range of $725 to $735 million, below the prior range of $725 million to $765 million.

73.     That same day, the Company filed its quarterly report on Form 10-Q with the SEC (the "3Q24 10-Q"). The 3Q23 10-Q disclosed that "[c]ertain members of the United States Congress have requested, and such members or other members may in the future request, information from or about the Company related to, among other things, the Company's admissions, length of stay and billing practices." The 3Q23 10-Q further stated that the Company "intends to cooperate with any such request. At this time, the Company cannot speculate on the outcome or duration of any such inquiries."

39

74.     In an earnings call held the next day, Defendant Hunter addressed the recent media scrutiny the Company had received, including the September 2024 Article, which revealed the Company's fraudulent admissions, length of stay, and billing practices at its psychiatric care facilities. In relevant part, Defendant Hunter stated:

> With respect to recent and [in]accurate media reports about Acadia behavioral health facilities. We want to share more about how our facilities operate and how we aim not only to meet, but exceed the standards that regulation requires.
>
> First, I want to be clear, medical necessity drives patient care decisions at Acadia. These decisions are made by licensed providers and adhere to all associated legal requirements. The allegation that Acadia systematically holds patients longer than medically necessary is false and goes directly against everything we do and stand for when it comes to patient care.

75.     Later during the same call, Defendant Dixon disclosed that the lowered full-year 2024 guidance was in part due to slower same-store patient day growth of only 3% in the month of October, "which we believe is a result of the recent headlines and reporting in the media that Chris [Hunter] addressed at the top of the call." CFO Dixon further stated:

> We do expect these headwinds to be transitory in nature, however, and as we have been doing for some time now, we continue to engage with our referral sources and our local communities to ensure that we are addressing any concerns as they arise. This change in our volume growth outlook for the fourth quarter resulted in a $20 million to $30 million impact to our revenue guidance and a $10 million to $15 million impact to our EBITDA outlook.

76.     During that same call, an analyst asked if the "media dynamics," particularly the September 2024 Article, and "subsequent inquiries" will continue to affect the Company's growth. In response, Defendant Dixon further addressed the negative impact on the Company's business, stating:

> I'll start with your question about sort of the step-down and what we saw. We did see that step down beginning at the start of October. And we saw that run pretty consistently throughout the month of October. So to answer your question, we didn't see a continued decline throughout the month. We saw relatively stable volumes for the month of October.

40

In regards to your question about sort of any concentration or where we saw this, we do, as I mentioned, expect that the recent news coverage and the news of the investigation has had some moderating effect on the growth that it's early days. We see this as largely temporary, and we've been working with our partners to sort of identify any specific questions that they have.

77.     The Individual Defendants further stated that the recent media coverage, including local coverage, had caused some level of concern from the Company's referral sources. For example, an analyst asked, "[M]aybe just circling back to the conversations you're having with the referral sources and your [joint venture] partners. So if you can walk us through what that looks like. And so far, what's the feedback? And are you seeing any change in behavior from those referral sources at this point?" In response, Defendant Hunter stated:

[A]s you can imagine, I mean, we've been highly engaged with outreach to really multiple stakeholders. I mean, certainly, key referral sources as well as [joint venture] partners for the last several months.

I would also say that we all know health care is local. And with so many of these literally thousands of referral sources being on the ground across the country, we've had to be even more deliberate about the outreach. I think, particularly to shore up any misunderstandings that sometimes have been the case due to media reporting.

*          *          *

W]e've been really consistent about emphasizing the quality of the care that we provide, the investments that we're making in safety, compliance, quality over the last 2 years. . . . And we placed a lot of emphasis on ensuring that our most important referral sources . . . understand where we believe some of the media reporting has been inconsistent or inaccurate.

*          *          *

I think in the small percentage of cases where we have heard any concern, these really tend to be a little bit more correlated with intense local media coverage within that facility local market rather than any broader news at the national level.

78.     Analysts swiftly reacted to this news. For example, Cantor analysts highlighted that Acadia "unexpectedly lowered revenue and EBITDA guidance due to lower October volumes, which management believes was directly correlated to a drop off in referrals after media outlets

41

alleged length of stay was influenced by ability to pay." Jefferies analysts commented, "Despite seeing positive volume momentum in Q3, the emergence of negative press reports on the company (NY Times article) and emergence of government investigations in Sept[ember] influenced patient referral sources, which translated to softer-than-expected trends in Oct[ober]."

79.     As the market digested this news, the price of Acadia Healthcare common stock fell $9.39 per share, or more than 18%, from a closing price of $52.08 per share on October 30, 2024, to a closing price of $42.69 per share on October 31, 2024, on extraordinary trading volume.

## THE INDIVIDUAL DEFENDANTS SOLD STOCK WHILE THE COMPANY'S STOCK PRICE WAS ARTIFICIALLY INFLATED

80.     As a result of the above false and misleading statements, the Company's share price was artificially inflated. Certain of the Individual Defendants, while in possession of material, non-public information, capitalized on the artificially inflated stock price by selling significant portions of their holdings of Acadia common stock. Specifically, Defendants Duckworth, Waud, Grieco, Osteen, Gregg, Miquelon, Hunter, and Dixon collectively sold more than 791,842 shares of their personally-held stock for collective gross proceeds in excess of $55.4 million, avoiding collective losses of more than $21.6 million.

81.     Defendant Duckworth sold a total of 162,129 shares while the price of the Company's stock was artificially inflated, earning approximately $11,818,703 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the wrongdoing.

42

| Date of Transaction | Average Share Price | Shares | Gross Proceeds[2] | Losses Avoided[3] |
|---|---|---|---|---|
| 2/26/2021 | $55.24 | 8,440 | $466,226 | $105,922 |
| 3/2/2021 | $56.04 | 694 | $38,892 | $9,265 |
| 3/11/2021 | $58.04 | 18,780 | $1,089,991 | $288,273 |
| 5/2/2021 | $60.92 | 946 | $57,630 | $17,246 |
| 2/25/2022 | $56.92 | 20,077 | $1,142,783 | $285,696 |
| 3/2/2022 | $60.64 | 694 | $42,084 | $12,457 |
| 3/24/2022 | $64.48 | 2,653 | $171,065 | $57,809 |
| 4/23/2022 | $68.01 | 523 | $35,569 | $13,242 |
| 5/2/2022 | $67.88 | 946 | $64,214 | $23,830 |
| 8/4/2022 | $81.00 | 100 | $8,100 | $3,831 |
| 8/5/2022 | $80.63 | 26,821 | $2,162,577 | $1,017,589 |
| 2/21/2023 | $80.87 | 76,830 | $6,213,242 | $2,933,369 |
| 3/24/2023 | $69.44 | 2,653 | $184,224 | $70,968 |
| 4/11/2023 | $73.27 | 503 | $36,855 | $15,382 |
| 4/23/2023 | $73.71 | 522 | $38,477 | $16,192 |
| 5/2/2023 | $70.51 | 947 | $66,773 | $26,346 |
| **Total** | | **162,129** | **$11,818,703** | **$4,897,416** |

82. Defendant Waud sold a total of 164,473 shares while the price of the Company's stock was artificially inflated, earning approximately $10,128,114 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the wrongdoing.

| Date of Transaction | Average Share Price | Shares | Gross Proceeds | Losses Avoided |
|---|---|---|---|---|
| 3/12/2021 | $59.12 | 109,443 | $6,470,270 | $1,798,148 |
| 6/14/2021 | $66.47 | 27,515 | $1,828,922 | $654,307 |
| 6/14/2021 | $66.47 | 27,515 | $1,828,922 | $654,307 |
| **Total** | | **164,473** | **$10,128,114** | **$3,106,762** |

---

[2] Rounded to the nearest whole dollar.
[3] Calculated using the $42.69 closing price on October 31, 2024, the day the truth fully emerged.

83.     Defendant Osteen sold a total of 445,251 shares while the price of the Company's stock was artificially inflated, earning approximately $32,147,902 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the wrongdoing.

| Date of Transaction | Average Share Price | Shares | Gross Proceeds | Losses Avoided |
|---|---|---|---|---|
| 1/31/2022 | $52.31 | 27,403 | $1,433,451 | $263,617 |
| 2/25/2022 | $56.92 | 118,075 | $6,720,829 | $1,680,207 |
| 2/21/2023 | $80.87 | 241,773 | $19,552,183 | $9,230,893 |
| 11/8/2023 | $74.21 | 15,000 | $1,113,150 | $472,800 |
| 12/12/2023 | $76.23 | 8,000 | $609,840 | $268,320 |
| 12/13/2023 | $77.67 | 35,000 | $2,718,450 | $1,224,300 |
| **Total** | | **445,251** | **$32,147,902** | **$13,140,137** |

84.     Defendant Grieco sold a total of 9,000 shares while the price of the Company's stock was artificially inflated, earning approximately $652,040 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the wrongdoing.

| Date of Transaction | Average Share Price | Shares | Gross Proceeds | Losses Avoided |
|---|---|---|---|---|
| 3/12/2021 | $59.02 | 2,000 | $118,040 | $32,660 |
| 3/15/2021 | $60.65 | 2,000 | $121,300 | $35,920 |
| 9/7/2022 | $82.54 | 5,000 | $412,700 | $199,250 |
| **Total** | | **9,000** | **$652,040** | **$267,830** |

85.     Defendant Hunter sold a total of 9,000 shares while the price of the Company's stock was artificially inflated, earning approximately $238,010 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and

44

omissions were exposed, demonstrate his motive in facilitating and participating in the wrongdoing.

| Date of Transaction | Average Share Price | Shares | Gross Proceeds | Losses Avoided |
|---|---|---|---|---|
| 4/11/2024 | $75.80 | 1,485 | $112,563 | $49,168 |
| 5/9/2024 | $66.06 | 1,899 | $125,448 | $44,380 |
| **Total** | | **3,384** | **$238,011** | **$93,548** |

86.     Defendant Dixon sold a total of 2,902 shares while the price of the Company's stock was artificially inflated, earning approximately $192,344 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the wrongdoing.

| Date of Transaction | Average Share Price | Shares | Gross Proceeds | Losses Avoided |
|---|---|---|---|---|
| 7/25/2024 | $66.28 | 2,902 | $192,345 | $68,458 |
| **Total** | | **2,902** | **$192,345** | **$68,458** |

87.     Defendant Gregg sold a total of 2,500 shares while the price of the Company's stock was artificially inflated, earning approximately $213,900 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the wrongdoing.

| Date of Transaction | Average Share Price | Shares | Gross Proceeds | Losses Avoided |
|---|---|---|---|---|
| 3/4/2024 | $85.56 | 2,500 | $213,900 | $107,175 |
| **Total** | | **2,500** | **$213,900** | **$107,175** |

88.     Defendant Miquelon sold a total of 2,203 shares while the price of the Company's stock was artificially inflated, earning approximately $188,114 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and

45

omissions were exposed, demonstrate his motive in facilitating and participating in the wrongdoing.

| Date of Transaction | Average Share Price | Shares | Gross Proceeds | Losses Avoided |
|---|---|---|---|---|
| 3/5/2024 | $85.39 | 2,203 | $188,114 | $94,068 |
| **Total** | | **2,203** | **$188,114** | **$94,068** |

## THE INDIVIDUAL DEFENDANTS CAUSED ACADIA TO REPURCHASE THE COMPANY'S COMMON STOCK AT ARTIFICIALLY INFLATED PRICES

89.     During the Relevant Period, Acadia repurchased its own shares at artificially inflated prices, causing substantial damage to the Company. As reported in the 3Q23 10-Q, between July 1, 2023 and September 30, 2023, the Company repurchased 14,390 shares of its own common stock for a total approximate cost of $1,074,789, or an average price of $74.69. Given that the Company's stock was actually worth only $42.69 per share,[4] Acadia overpaid for those purchases by approximately $460,480.

## DAMAGES TO ACADIA

90.     As a direct and proximate result of the Individual Defendants' misconduct, Acadia has expended and will continue to expend many millions of dollars.

91.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

92.     Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts

---

[4] The price at the close of trading on October 31, 2024, after the truth fully emerged.

46

associated with the Company's violations.

93.     Such also expenditures include the approximately $123 million that the Individual Defendants caused the Company to overpay for repurchases of its own stock while the stock price was artificially inflated as a result of the false and misleading statements alleged herein.

94.     As a direct and proximate result of the Individual Defendants' conduct, Acadia has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

95.     Plaintiff brings this action derivatively in the right of and for the benefit of Acadia to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, violations of federal law, waste of corporate assets, and other wrongful conduct as alleged herein.

96.     Acadia is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

97.     Plaintiff is an owner of Acadia stock and has been a continuous shareholder of Company stock at all relevant times.

98.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

99.     A pre-suit demand on the Board is futile and therefore, excused. At the time this suit was filed, the Board consisted of the following ten individuals: Defendants Hunter, Waud, Bernhard, Bissell, Gregg, Grieco, Fucci, Kelly, Harris, and Miquelon (the "Director Defendants").

47

Plaintiff is required to show that a majority of the current Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

100.     Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

101.     The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

102.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements and omissions, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

103.     Additional reasons that demand on Defendant Hunter is futile follow. Defendant Hunter has served as a Company director and as the Company's CEO since April 2022. Thus, as the Company admits in the 2024 Proxy Statement, Defendant Hunter is a non-independent director. The Company provides Defendant Hunter with his principal occupation for which he receives significant compensation as detailed above. As a trusted Company director, he conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously

48

disregarded his duties to protect corporate assets. Defendant Hunter signed the 2022 and 2023 10-Ks, which contained false and misleading statements. Defendant Hunter is named as a defendant in the Securities Class Actions and thus, faces potential liability. For these reasons, Defendant Hunter breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

104. Additional reasons that demand on Defendant Waud is futile follow. Defendant Waud has served as a Company director since December 2005. Defendant Waud serves as Chairman of the Board. The Company provides Defendant Waud with significant compensation as detailed above. As a trusted Company director, he conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect corporate assets. Defendant Waud signed the 2019, 2020, 2021, 2022 and 2023 10-Ks, which contained false and misleading statements. For these reasons, Defendant Waud breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

105. Additional reasons that demand on Defendant Bernhard is futile follow. Defendant Bernhard has served as a Company director since December 2019. The Company provides Defendant Bernhard with significant compensation as detailed above. As a trusted Company director, he conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect corporate assets. Defendant Bernhard signed the 2019, 2020, 2021, 2022 and 2023 10-Ks, which contained false and misleading statements. For these reasons, Defendant Bernhard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

49

106.    Additional reasons that demand on Defendant Bissell is futile follow. Defendant Bissell has served as a Company director since April 2013. The Company provides Defendant Bissell with significant compensation as detailed above. As a trusted Company director, he conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect corporate assets. Defendant Bissell signed the 2019, 2020, 2021, 2022 and 2023 10-Ks, which contained false and misleading statements. For these reasons, Defendant Bissell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

107.    Additional reasons that demand on Defendant Fucci is futile follow. Defendant Fucci has served as a Company director since October 2020. The Company provides Defendant Fucci with significant compensation as detailed above. As a trusted Company director, he conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect corporate assets. Defendant Fucci signed the 2020, 2021, 2022 and 2023 10-Ks, which contained false and misleading statements. For these reasons, Defendant Fucci breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

108.    Additional reasons that demand on Defendant Gregg is futile follow. Defendant Gregg has served as a Company director since May 2016. The Company provides Defendant Gregg with significant compensation as detailed above. As a trusted Company director, she conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded her duties to protect corporate assets. Defendant Gregg signed the 2019, 2020, 2021, 2022 and 2023 10-Ks, which contained false and misleading statements. For

these reasons, Defendant Gregg breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

109.    Additional reasons that demand on Defendant Grieco is futile follow. Defendant Grieco has served as a Company director since November 2011. The Company provides Defendant Grieco with significant compensation as detailed above. As a trusted Company director, he conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect corporate assets. Defendant Grieco signed the 2019, 2020, 2021, 2022 and 2023 10-Ks, which contained false and misleading statements. For these reasons, Defendant Grieco breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

110.    Additional reasons that demand on Defendant Harris is futile follow. Defendant Harris has served as a Company director since 2023. The Company provides Defendant Harris with significant compensation as detailed above. As a trusted Company director, she conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded her duties to protect corporate assets. Defendant Harris signed the 2023 10-K, which contained false and misleading statements. For these reasons, Defendant Harris breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

111.    Additional reasons that demand on Defendant Kelly is futile follow. Defendant Kelly has served as a Company director since June 2022. The Company provides Defendant Kelly with significant compensation as detailed above. As a trusted Company director, he conducted

little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect corporate assets. Defendant Kelly signed the 2022 and 2023 10-Ks, which contained false and misleading statements. For these reasons, Defendant Kelly breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

112.    Additional reasons that demand on Defendant Miquelon is futile follow. Defendant Miquelon has served as a Company director since January 2012. The Company provides Defendant Miquelon with significant compensation as detailed above. As a trusted Company director, he conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect corporate assets. Defendant Miquelon signed the 2019, 2020, 2021, 2022 and 2023 10-Ks, which contained false and misleading statements. For these reasons, Defendant Miquelon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

113.    Defendants Grieco, Bissell, Fucci, and Waud either serve, or served during the Relevant Period, as members of the Audit and Risk Committee and, pursuant to the Audit and Risk Committee Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Individual Defendants breached their fiduciary duties to the Company by failing to prevent or correct the issuance of material misstatements and omissions regarding material deficiencies in the Company's accounting practices and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Grieco, Bissell, Fucci, and Waud cannot independently consider any

52

demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

114.    Additionally, certain of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Those Director Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Acadia stock and stock options they held.

115.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct, which goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to Acadia's standards of business conduct. Furthermore, Defendants Hunter, Osteen, Duckworth, and Dixon, as senior financial officers, were subject to the Company's Code of Ethics. The Individual Defendants violated the Code of Conduct, and Defendants Hunter, Osteen, Duckworth, and Dixon violated the Code of Ethics, because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

116.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein.

They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

117.    The Director Defendants may be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Acadia. If there is a liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Acadia, there would be no insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

118.    If there is no liability insurance, then the Director Defendants will not cause Acadia to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

119.    Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT ONE

**Against the Individual Defendants for Violations of Section 10(b) and Rule
10b-5 of the Exchange Act**

120.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

121.     The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

122.     The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded to be misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

123.     The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Acadia not misleading.

124.     The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Acadia.

125.     The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and omissions of

55

material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

126.    As a result of the foregoing, the market price of Acadia common stock was artificially inflated during the relevant period. In ignorance of the falsity of the statements, Plaintiff relied on the statements described above and/or the integrity of the market price of Acadia common stock in purchasing Acadia common stock at prices that were artificially inflated as a result of the false and misleading statements and was damaged thereby. In addition, Acadia was damaged by the Individual Defendants' violations of §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase 14,390 of its own shares at artificially inflated prices, causing damage to the Company.

127.    Plaintiff, on behalf of Acadia, has no adequate remedy at law.

## COUNT TWO

**Against Defendants Osteen, Hunter, Duckworth, and Dixon for Contribution Under Sections 10(b) and 21D of the Exchange Act**

128.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

129.    The conduct of Defendants Osteen, Hunter, Duckworth, and Dixon as described herein has exposed the Company to significant liability under various federal securities laws by their misconduct.

130.    Acadia and Defendants Osteen, Hunter, Duckworth, and Dixon are named as defendants in the related Securities Class Action that alleges and asserts claims arising under the federal securities laws. Acadia is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.

131.    If Acadia is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of Defendants Osteen, Hunter, Duckworth, and Dixon as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. Acadia is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

132.    As officers and directors, Defendants Osteen, Hunter, Duckworth, and Dixon had the power or ability to, and did, control or influence, either directly or indirectly, Acadia's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

133.    The Individual Defendants are liable under §21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

134.    Defendants Osteen, Hunter, Duckworth, and Dixon have damaged the Company and are liable to the Company for contribution.

135.    As such, Acadia is entitled to receive all appropriate contribution or indemnification from Defendants Osteen, Hunter, Duckworth, and Dixon.

## COUNT THREE

### Against the Individual Defendants for Breach of Fiduciary Duties

136.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

137.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Acadia's business and affairs.

138.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

139.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Acadia.

140.     In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

141.     In further breach of their fiduciary duties owed to Acadia, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) Acadia admitted patients and held them against their will and beyond the length of time that was medically necessary in order to deceive payors into continuing to pay for such patients' care; (2) Acadia would not release patients until their insurance ran out; (3) in order to achieve the above, Acadia deployed Company assessors to pressure hospitals to send patients to Company facilities, filed frivolous petitions with courts to delay patients' release, and directed employees to use buzzwords and avoid using other words in patients' charts to create a false impression of patients' mental state; (4) Acadia's admissions, length of stay, and billing practices would subject the Company to government

58

investigations and actions and heightened media scrutiny; (5) in light of such government investigations and actions and media scrutiny, Acadia's relationships with its referral sources would be negatively impacted; and (6) as a result of the above, Acadia experienced slower same-store patient volumes, and in turn, the Company would be forced to lower its full-year 2024 outlook.

142. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

143. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

144. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed

knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

145.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

146.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Acadia has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

147.    Plaintiff on behalf of Acadia has no adequate remedy at law.

## COUNT FOUR

### Against Defendants Duckworth, Waud, Grieco, Osteen, Gregg, Miquelon, Hunter, and Dixon for Insider Selling

148.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

149.    By reason of their fiduciary roles as officers, directors, and/or controlling persons of Acadia, Defendants Duckworth, Waud, Grieco, Osteen, Gregg, Miquelon, Hunter, and Dixon (the "Insider Selling Defendants") specifically owed Acadia the highest obligation of due care, good faith, and loyalty.

150.    As officers, directors, and/or controlling persons of the Company, the Insider Selling Defendants were given access, directly or indirectly, to material information about the Company, as described above, which was not generally available to the public.

151.    When the Insider Selling Defendants sold their Company stock, as detailed *supra*, they were in possession of material, non-public information, and sold Company stock on the basis of such information; information which they each knew had a significant effect on the market price

60

of the Company's stock.

152.     The information described above was proprietary, non-public information concerning the Company's business operations and financial condition.  It was a proprietary asset belonging to Acadia, which the Insider Selling Defendants misappropriated to their own benefit when they sold holdings in Company stock.  The Insider Selling Defendants knew that this information was not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of Company stock. As the use of Acadia's proprietary information for their own personal gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, Acadia is entitled to disgorge any illegal profits obtained thereby.

**COUNT FIVE**

**Against the Individual Defendants for Unjust Enrichment**

153.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

154.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Acadia.

155.     The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Acadia that was tied to the performance or artificially-inflated valuation of Acadia or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

156.     Plaintiff, as a shareholder and a representative of Acadia, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from

61

insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

157. Plaintiff on behalf of Acadia has no adequate remedy at law.

## COUNT SIX

### Against the Individual Defendants for Waste of Corporate Assets

158. Plaintiff incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

159. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

160. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (1) paying excessive compensation, bonuses, and termination payments to certain of its executive officers, as detailed, *supra*; (2) awarding self-interested stock options to certain officers and directors; and (3) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Actions, addressing the Individual Defendants' unlawful action.

161. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

162. Plaintiff, on behalf of Acadia, has no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Acadia and that Plaintiff is a proper and adequate representative of the Company;

62

B.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.     Directing Acadia to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Acadia and its stockholders from a repeat of the damaging events described herein, including, but not limited to strengthening the Company's internal reporting and financial disclosure controls;

D.     Awarding punitive damages;

E.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: February 13, 2025

**BRAMLETT LAW OFFICES**

*/s/ Paul Kent Bramlett*
PAUL KENT BRAMLETT #7387
ROBERT PRESTON BRAMLETT #25895
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215-0734
Telephone: 615-248-2828
Facsimile: 866-816-4116
Email: PKNASHLAW@AOL.COM
-and-
**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*